# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARVIE B. CARROLL, | CASE NO. 1:10-cv-00623-LJO-SKO PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| v. | |
| JAMES A. YATES, et al., | |
| Defendants. | (Docs. 46, 72, and 89) |
| / | THIRTY-DAY OBJECTION DEADLINE |

### Findings and Recommendations - Cross-Motions for Summary Judgment

## I.     Procedural History

Plaintiff Arvie B. Carroll, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on April 9, 2010.  This action for damages is proceeding on Plaintiff's amended complaint, filed on April 12, 2011, against Defendants Dutra and T. Soto, aka T. Brown, for acting with deliberate indifference to Plaintiff's serious medical needs on the morning of December 17, 2008, at Pleasant Valley State Prison.[1,2]  28 U.S.C. § 1915A.

---

[1] T. Soto aka T. Brown will be referred to herein as Soto.

[2] Plaintiff's claims arising from inadequate footwear were dismissed, without prejudice, under Federal Rule of Civil Procedure 18; and Plaintiff's Eighth Amendment claim based on the prison's outdoor staging policy was dismissed, Plaintiff's Eighth Amendment claim arising out of his eye injury was dismissed as to all named defendants except for Dutra and Soto, Plaintiff's claim for injunctive relief was dismissed, Plaintiff's state law claims were dismissed, and Defendants Yates, Trimble, Mattingly, Davis, Grannis, Broddrich, Walker, Igbinosa, Nesbit, Duran, Bennett, Greene, Oxborrow, Samareta, and Valdez were dismissed, for failure to state a claim.  28 U.S.C. § 1915A. (Docs. 20, 23.)

On March 28, 2012, Plaintiff filed a motion for summary judgment on his Eighth Amendment claim against Defendant Dutra. Fed. R. Civ. P. 56(a). Defendants Dutra and Soto filed an opposition and a cross-motion for summary judgment on July 26, 2012. Plaintiff filed an opposition and a reply on August 13, 2012, and Defendants filed their reply on September 24, 2012.[3] On October 5, 2012, Plaintiff filed a motion seeking leave to file a surreply and a surreply. The parties' cross-motions for summary judgment have been submitted upon the record, and these findings and recommendations now issue. Local Rule 230(l).

## II.   Legal Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1807. Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the

---

[3] In addition to the earlier notice of the requirements for opposing a motion for summary judgment provided by the Court on May 25, 2011, Defendants issued a contemporaneous notice on July 26, 2012, in compliance with Woods v. Carey, 684 F.3d 934, 935-36 (9th Cir. 2012).

burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011), cert. denied, 132 S.Ct. 1566 (quotation marks and citation omitted).

**III.   Discussion**

**A.   Leave to File Surreply and Evidentiary Objections**

As an initial matter, the Court shall address Plaintiff's request for leave to file a surreply; the parties' evidentiary objections relating to the declarations of Plaintiff and Dr. Bruce Barnett and the permissible scope of their testimony, as these are the primary objections at issue; and Defendants' objections to Plaintiff's prison records for lack of authentication.  The remaining objections, to the extent it is necessary to address them, will be addressed in subsection D.

**1.   Surreply**

Plaintiff seeks leave to file a surreply to address the supplemental declaration of Dr. Bruce Barnett, which was filed by Defendants on September 24, 2012, in support of their reply to Plaintiff's opposition to their cross-motion for summary judgment.  The Court shall exercise its discretion to permit the surreply and Plaintiff's motion is therefore granted.

**2.   Limitation on Scope of Plaintiff's Testimony as a Lay Witness**

Plaintiff's amended complaint is signed under penalty of perjury and his motion for summary judgment, opposition/reply to Defendants' cross-motion/opposition, and surreply are supported by declarations signed under the penalty of perjury.  These filings constitute evidence to the extent that they are based on Plaintiff's personal knowledge of facts admissible in evidence, and not merely on

his belief. <u>Moran v. Selig</u>, 447 F.3d 748, 759-60 (9th Cir. 2006); <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004); <u>Johnson v. Meltzer</u>, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); <u>Lew v. Kona Hosp.</u>, 754 F.2d 1420, 1423 (9th Cir. 1985).

As a lay witness, Plaintiff may testify as to matters which are rationally based on his perception, helpful in determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701 (quotation marks omitted). Such matters include what Plaintiff saw or felt with respect to the condition of his left eye. Plaintiff may also testify that he was diagnosed with Graves' disease and that it is a thyroid condition, as that is information which would be personally known to a patient on the receiving end of a diagnosis. Plaintiff may also testify that he does not have 20/20 vision and wears corrective lenses. A lay witness would know that he cannot see clearly without corrective lenses and that he has been prescribed and wears corrective lenses.

However, Plaintiff may not testify as to any matters which require medical expertise. Such matters include that people with Graves' disease heal slower than others, that Plaintiff's left eye healed slower than normal due to his Graves' disease, and that his left eye was still healing both when he was transferred to PVSP and on December 17, 2008. These are matters outside of those which lay witnesses may testify; they require the testimony of a medical expert.

### 3. Dr. Barnett

In his opposition to Defendants' cross-motion, Plaintiff, citing to Federal Rules of Evidence 402 and 602, objects repeatedly to Dr. Barnett's testimony on the grounds that Barnett "lacks a credible foundation." (E.g., Doc. 78, Opp., court record p. 6, lns. 17-18.) Plaintiff also notes in his surreply that Defendants submitted a supplemental declaration by Dr. Barnett in which he attests that he has experience in treating patients post-surgery and in treating patients with thyroid and eye issues. (Doc. 89, Surreply ¶ 2.) Plaintiff argues that Dr. Barnett's curriculum vitae is silent as to such experience and the submission of a supplemental declaration shows that Plaintiff effectively demonstrated that Dr. Barnett misled the Court with misrepresentations, factual omissions, and

documents and facts lacking genuineness.  (Id., p. 2, lns. 22-25.)  Plaintiff seeks to have either an evidentiary hearing or Dr. Barnett's declarations stricken from the record under the sham affidavit rule.

### a.     Evidentiary Hearing and Sham Affidavit Rule

Plaintiff's request for an evidentiary hearing is denied.  The Court is able to resolve evidentiary objections on the record without a hearing.

With respect to sham affidavits, the rule applies in situations in which a party attempts to "create an issue of fact by an affidavit contradicting his prior deposition testimony."  Van Asdale v. Int'l Game Technology, 577 F.3d 989, 998 (9th Cir. 2009).  While the rule is to be applied with caution in any event, Van Asdale, 577 F.3d at 998, Plaintiff's invocation of the sham affidavit rule here is misplaced.  Dr. Barnett is not a party to this litigation, and the fact that witnesses are contradicting *each other* in competing declarations is part and parcel of litigation.  Defendants are entitled to reply to Plaintiff's opposition and address any issues he raises therein.  Defendants have done so and properly supported their reply with Dr. Barnett's supplemental declaration.

### b.     Rule 402

Turning to Plaintiff's evidentiary objections relating to Dr. Barnett, Rule 402 simply provides that relevant evidence is generally admissible unless otherwise proscribed.  The rule does not support Plaintiff's objections and the objections on this ground are overruled.  Fed. R. Evid. 402.

### c.     Rule 602

Rule 602 requires that a witness have personal knowledge to testify as to a matter.  Fed. R. Evid. 602. However, Rule 602 does *not* apply to expert witnesses, which is the capacity in which Dr. Barnett is testifying.  The objections on this ground are overruled,

### d.     Rule 702

Rule 702 governs the admissibility of expert opinion testimony and it provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

This is a medical care case involving the questions whether, due to prior cataract surgery, exposure of Plaintiff's left eye to harsh weather conditions was medically contraindicated, constituting a serious medical need, and if so, whether that need was knowingly disregarded by Defendants Dutra and Soto on December 17, 2008. Dr. Barnett is a board certified family physician who has been licensed in the State of California as a physician and surgeon since 1978; he received his medical degree from Harvard Medical School; and he completed his residency training in family practice at the University of Southern California.

Although Dr. Barnett attests in his supplemental declaration that he has experience treating post-surgical patients and experience treating patients with thyroid and eye issues, as a medical doctor with years of experience and board certified in family practice, Dr. Barnett is qualified to testify as an expert witness on medical issues and he was so qualified without the benefit of the supplemental declaration.[4] Plaintiff's objections to Dr. Barnett's competency to testify as a medical expert lack merit and they are overruled. E.g., United States v. Finley, 301 F.3d 1000, 1007 (9th Cir. 2002); United States v. Garcia, 7 F.3d 885, 889-90 (9th Cir. 1993).

As an expert witness, Dr. Barnett is entitled to review Plaintiff's medical file, interpret Plaintiff's medical records, and testify accordingly. To the extent that Plaintiff attests, for example, that he was not examined on a particular date where a medical record has been submitted to prove otherwise, this differing account creates a disputed issue of fact; it does not create an issue with respect to Dr. Barnett's competency to testify regarding events based on his review of the medical

---

[4] Any argument that Dr. Barnett is not an endocrinologist or otolaryngologist specializing in thyroid issues or an ophthalmologist specializing in eyes issues goes to the weight of testimony and not to its admissibility as expert opinion. United States v. Garcia, 7 F.3d 885, 889-90 n.2 (9th Cir. 1993). As a medical doctor, Dr. Barnett is qualified to testify as to medical issues, including post-surgical issues, eye issues, and thyroid issues.

records.[5]  Fed. R. Evid. 703.  Interpretation of medical records, by contrast, must be done by a medical expert, and Plaintiff, as a lay witness, cannot succeed in raising a triable issue of fact by merely arguing with the expert's opinion over what the records state.

### 4.   Prison Records - Lack of Authentication

Unauthenticated documents cannot be considered in a motion for summary judgment, Las Vegas Sands, LLC v. Nehme, 632 F.3d 526, 533 (9th Cir. 2011) (citing Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), and therefore, lack of proper authentication can be an appropriate objection where the documents' authenticity is genuinely in dispute.  However, where a document has been authenticated by a party, the authentication requirement is satisfied for all parties as to that document.  Orr, 285 F.3d at 776.

Further, an inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility, Orr, 285 F.3d at 776, and documents may be authenticated by review of their contents if they appear to be sufficiently genuine, Las Vegas Sands, LLC, 632 F.3d at 533 (citing Orr, 285 F.3d at 778 n.24) (quotation marks omitted).  While Defendants object to various prison records submitted by Plaintiff on the ground that they lack authentication, there is no indication in the record that these documents are not official prison records maintained in Plaintiff's prison file(s).  The characteristics of the records themselves in terms of appearance, contents, and substance allow the Court to conclude that the documents have been authenticated by their distinctive characteristics and that they are what they appear to be: official prison records.  Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533; see also Abdullah v. CDC, No. CIV S-06-2378 MCE JFM P, 2010 WL4813572, at *3 (E.D.Cal. Nov. 19, 2010) (finding an objection for lack of foundation and authentication unavailing where the records were from the plaintiff's prison file and they were created and maintained by prison officials); Sanchez v. Penner, No. CIV S-07-0542 MCE EFB P, 2009 WL 3088331, at *5 (E.D.Cal. Sept. 22, 2009) (overruling lack of foundation and proper

---

[5] Plaintiff may testify that he was not seen for a medical appointment on a particular date, as that is information which would be within Plaintiff's personal knowledge and which does not require medical expertise.

authentication objections to prison medical records submitted by the plaintiff); Johnson v. Roche, No. CIV S-06-1676 GEB EFB P, 2009 WL 720891, at *6 (E.D.Cal. Mar. 13, 2009) (overruling lack of foundation and proper authentication objections to prison records); Burch, 433 F.Supp.2d at 1119 (overruling objections to the introduction of documentary evidence where the defendants did not actually dispute the authenticity of them and where the plaintiff would be able to authenticate them at trial).

If Defendants genuinely disputed the authenticity of any of these prison records, more specific objections as to the records in dispute could have been made. Defendants' bare objections to Plaintiff's prison records for lack of proper authentication are overruled. Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533.

## B.     Summary of Plaintiff's Claim[6]

In his amended complaint, Plaintiff alleges that while at Kern Valley State Prison, he had surgery to remove a cataract from his left eye. Plaintiff further alleges that he was instructed not to let water get in his eye; he was prescribed "Prednisolene, Moxifloxa, and Ketorolac" following the surgery; and he suffers from hyperthyroidism, which slowed the healing of his eye. (Doc. 17, Amend. Comp., ¶¶23, 24.)

On November 17, 2008, Plaintiff was transferred to Pleasant Valley State Prison (PVSP). Medical staff reviewed Plaintiff's medical information, noted his history of tuberculosis and his recent eye surgery, and provided Plaintiff with prescriptions for his thyroid condition and eye pending an initial appointment with a doctor.

On December 16, 2008, Plaintiff was given a next-day pass to the medical clinic to have a blood draw. When Plaintiff arrived in the morning, it was about 48 degrees and damp outside. After Plaintiff turned over his identification card to Defendant Dutra, Defendant ordered him to wait outside instead of in the indoor holding cell. Plaintiff objected on the grounds that it was cold and

---

[6] Plaintiff's amended complaint is verified and therefore, it must be treated as an opposing declaration to the extent it is based on Plaintiff's personal knowledge of specific facts which are admissible in evidence. Jones, 393 F.3d at 923. This subsection is merely a summary of Plaintiff's legal claim as pled and the recitation of factual allegations herein does not represent a finding as to the admissibility of the allegations as evidence.

damp, he had an eye injury, and the indoor holding cell was empty.  Plaintiff's request to wait in the holding cell was denied by Defendant Dutra, who told Plaintiff that PVSP's policy was to make inmates wait outside on the par course regardless of weather.

Medical clinic staff members were not performing any medical duties at that time but were socializing, and Plaintiff argued that he should not have to wait outside in the foul weather with an eye wound while staff sat around talking about their social lives.  Defendant Dutra reiterated PVSP's outdoor staging policy and ordered Plaintiff out of the clinic.

After approximately 30 minutes, Plaintiff's eye began to tear up and hurt.  Alarmed, Plaintiff reentered the clinic, reported the pain and tearing to Defendant Dutra, and requested to wait in the holding cell.  Defendant Dutra denied the request based on the outdoor staging policy, at which time Plaintiff requested that he be allowed to return to his housing unit to wait until Defendant Soto, the lab technician, was ready to start.

Defendant Dutra denied the request and told Plaintiff that if he returned to his housing unit, he would have to sign a form refusing medical treatment.  Plaintiff responded that he was not refusing medical treatment and he was asking to return to his housing unit to wait only because the cold outdoor weather was causing his left eye to hurt and tear up.  Defendant Dutra insisted that the policy was for inmates to wait outside and Plaintiff would have to go back outside if he did not want to sign a treatment refusal form.  Plaintiff again asked to wait in the empty holding cell, but Defendant Dutra refused and ordered him back outside.

Plaintiff went back outside, but after 15 minutes, he could not stand the pain and tearing any longer.  Plaintiff went inside and once again requested to wait in the holding cell.  After Defendant Dutra denied his request, Plaintiff asked for his ID card back so he could return to his housing unit.  Defendant Dutra refused to give Plaintiff his ID card unless he signed a treatment refusal form, so Plaintiff finally signed the form, in pain and under duress.

When Plaintiff returned to his housing unit and looked in the mirror, he saw blood in the white of his left eye and yellow discharge oozing from the corner of the eye.  Plaintiff alleges that

///

a white mass subsequently appeared, hampering his vision, and his eye began to feel constantly swollen.

## C. **Undisputed Facts**

1. Plaintiff is currently incarcerated at PVSP, where the events relevant to this action occurred.

2. Defendant Dutra is employed by the California Department of Corrections and Rehabilitation (CDCR) at PVSP as an A Facility medical clinic escort officer, and he has held the position since 2008.

3. In 2008, Defendant Soto was employed by CDCR as a phlebotomist.

4. On September 16, 2008, Dr. Yaplee, an ophthalmologist, performed cataract surgery on Plaintiff's left eye at the Triangle Eye Center in Delano, California.

5. Plaintiff has, and had at the time of his eye surgery, Graves' disease, an autoimmune disease also known as hypothyroidism.

6. Plaintiff was seen by Dr. Yaplee for follow-up appointments on September 18, 2008, and September 23, 2008; and Dr. Yaplee noted that Plaintiff was doing well and no problems were observed.

7. Plaintiff was transferred from Kern Valley State Prison to PVSP on November 17, 2008, at which time medical staff in receiving and release placed him on a list to see a doctor and supplied him with eye antibiotics and anti-inflammatory medications.

8. On November 25, 2008, Plaintiff was referred to optometry.

9. On December 1, 2008, Plaintiff had a primary care examination for his thyroid condition and a follow-up from his cataract surgery. The clinician examined Plaintiff's eyes and noted that they left eye showed slightly more hyperthyroid prominence than the right eye but the eye examination was otherwise unremarkable.

10. On the evening of December 16, 2008, Defendant Soto issued Plaintiff a next-day pass for lab work at the Facility A clinic at 8:30 a.m., relating to his Graves' disease.

11. On the morning of December 17, 2008, Plaintiff did not have an injury to his eye and his vision was not impaired.

12.   When Plaintiff left his cell, the sky was gray and it was cold and damp outside, but it was not raining.  The temperature on that day ranged between a low of 27 to 35 and a high of 54 to 56, with the temperature at 8:18 a.m. being at or slightly above the low.[7]

13.   Plaintiff arrived at the clinic at approximately 8:18 a.m.

14.   Defendants Dutra and Soto were assigned to the Facility A medical clinic and were working there on December 17, 2008.

15.   Defendant Dutra was the custody officer assigned to the clinic and after Plaintiff surrendered his CDCR ID card, Dutra had Plaintiff wait outside the clinic for his lab appointment, where it was cold and damp.

16.   Plaintiff requested to wait inside in the holding cell.

17.   Defendant Dutra told Plaintiff to wait outside and did not allow him to wait in the holding cell.

18.   After waiting outside for approximately 30 minutes, Plaintiff again requested that Defendant Dutra allow him to wait inside in the holding cell.

---

[7] Defendants request judicial notice of the National Oceanic and Atmospheric Administration's (NOAA) Record of River and Climatological Observations for Coalinga, California in December 2008, for the purposes of establishing the temperature range on December 17, 2008, and establishing that it was 36 degrees at 8:00 a.m. on that date.  (Doc. 72-9; Ex. A.)  Plaintiff's objection to the exhibit on the grounds that it "is fraudulent and misleading" lacks any merit and is overruled.  (Doc. 78, Opp./Reply, p 6 lns. 8-9.)  NOAA is a government agency and the document at issue is a public record; Defendants' request for judicial notice is granted.  Fed. R. Evid. 201(b); United States v. 14.02 Acres of Land More or Less in Fresno County, 547 F.3d 943, 955 (9th Cir. 2008).
        Although Plaintiff initially attested that the temperature was approximately 48 degrees, he subsequently submitted a printout from weathersource.com as evidence that the temperature ranged from 27 to 56 on December 17, 2008.  (Doc. 79, Ex. 2.)  Defendants object to the exhibit on the grounds that it is hearsay and it lacks authentication.  In as much as the relevant contents are temperature records obtained from NOAA, Defendants' hearsay objection is overruled.  Fed. R. Evid. 803(6).  With respect to authentication, Plaintiff is proceeding pro se and he is incarcerated, which necessarily limits his ability to obtain documents.  Plaintiff attests that he obtained the document from his wife, who obtained it from the internet.  (Doc. 80, p. 2, lns. 2-5.)  The Court is mindful that an inquiry into authenticity concerns the genuineness of an item of evidence, Orr, 285 F.3d at 776, and the printout at issue (1) relates to weather conditions, (2) includes the webpage URL address and the date it was printed, and (3) includes the statement that the weather data comes from NOAA.  Under these very specific and limited circumstances, the Court overrules Defendants' objection and will consider the document.
        In considering both documents, the minor discrepancies between the temperature ranges are not material, as the resolution of the cross-motions is the same whether the low temperature was 27 degrees or 35 degrees.  In resolving the motions, the Court accepts as true that on December 17, 2008, the low temperature was between 27 and 35 and the high temperature was between 54 and 56.  In doing so, the Court notes that neither party provided evidence of the exact temperature outside the medical clinic around 8:30 a.m. on December 17, 2008, and Plaintiff is not qualified to opine regarding temperatures around bodies of water, ambient temperatures, etc.  Fed. R. Evid. 701, 702.  (Doc. 78, 6:8-16.)

19.   After his request was denied, Plaintiff requested to be allowed to return to his housing unit and be called back to the clinic when Defendant Soto, the lab technician, was ready to start Plaintiff's lab work.

20.   Defendant Dutra denied Plaintiff's request to return to his housing unit.

21.   Plaintiff again requested to wait inside in the holding cell, but Defendant Dutra denied his request and ordered him to wait outside the clinic.

22.   After being ordered out of the clinic, Plaintiff waited outside approximately 15 minutes, reentered the clinic, and requested to wait in the holding cell.  Defendant Dutra refused Plaintiff's request.

23.   Plaintiff signed a medical treatment refusal form and returned to his cell.

24.   On December 17, 2008, there was no official or written policy mandating that inmates be compelled to wait outside the clinic in any weather for their appointments.

25.   By December 17, 2008, three months had passed since Plaintiff's cataract surgery.  Unless significant complications occur, cataract patients are essentially healed from surgery within a month and no significant complications occurred with Plaintiff's surgery.[8]  Plaintiff's medical records indicate that by December 17, 2008, Plaintiff's eye had healed from the cataract surgery, his eye was about as vulnerable to injury as an average person's eye, and an average person's eye is not at serious risk from standing outside for 1 hour and 22 minutes in damp weather conditions.[9]

///

---

[8] Although Plaintiff objects to this fact, as previously stated, Plaintiff is not competent to testify that because he has Graves' disease, he heals much slower than the average person; and Plaintiff has not submitted any admissible evidence showing that he heals slower than the average person or that he was still healing on December 17, 2008.

[9] Defendants point out that Plaintiff alleges he was outside the clinic for both 1 hour and 22 minutes and for 45 minutes without clarifying the discrepancy, and they will therefore assume that he was outside for 1 hour and 22 minutes.  (Doc. 72-1, p. 3 n.1.)  In his verified amended complaint and declaration, Plaintiff attests that he was outside for approximately 45 minutes, but in his deposition, Plaintiff attested that he was outside for approximately 1 hour and 22 minutes.  (Doc. 17, Amend. Comp., ¶¶35-39; Doc. 47, Carroll Dec., ¶¶8-10; Doc. 73, Depo., court record p. 7, lns. 7-25.)  For the purpose of resolving the cross-motions, the Court will accept as true that the time frame Plaintiff was outdoors was 1 hour and 22 minutes and the Court notes that Defendants' evidence addresses the longer outdoor wait of 1 hour and 22 minutes.  (Doc. 72-5, Barnett Dec., ¶29.)

26. Following the December 17, 2008, incident at the clinic, Plaintiff was seen by several doctors regarding complaints about his left eye, but between December 17, 2008, and April 2, 2009, Plaintiff did not have any routine or emergency appointments with an ophthalmologist.

27. On December 30, 2008, an optometrist performed an examination of Plaintiff as a follow-up to his cataract surgery.  No abnormalities were reported and the examination notes do not indicate that Plaintiff reported any complaint regarding his eyes.

28. On April 3, 2009, Plaintiff was seen by Dr. Yaplee for a follow-up from his cataract surgery. Dr. Yaplee found vitreous floaters in Plaintiff left eye, and he also suspected retinal detachment and advised PVSP medical staff to observe Plaintiff's left eye for any signs of retinal detachment.

29. On September 4, 2009, Dr. Yaplee performed a routine follow-up ophthalmology examination on Plaintiff, and he noted no remarkable findings and no changes.

30. On September 4, 2009, Plaintiff met with a primary care provider after his return from his ophthalmology consultation and the clinician noted no complaints of problems.

31. On January 6, 2010, Plaintiff met with Dr. Rohrdanz regarding his thyroid issues.  After a physical assessment, Dr. Rohrdanz noted a normal finding on the eye examination.

32. On March 23, 2010, Plaintiff received a routine eye examination from an optometrist. Plaintiff complained about white matter in the iris of his left eye, which had obscured his vision for the past 1 to 1 ½ years.  The optometrist noted that Plaintiff had pigment in his iris and referred Plaintiff to ophthalmology.

33. On May 12, 2010, Plaintiff received an ophthalmology examination by Dr. S. Sofinski.  Dr. Sofinski noted a few pigment fragments from the residual cortex at the periphery of the left eye iris and noted that the dissolving of the residual cortex explained Plaintiff's reports of floaters in his left eye.  No other abnormality was detected.

34. On May 27, 2010, Plaintiff received an ophthalmology examination from Dr. Yaplee, who found no eye disease and diagnosed myopia and mild capsular fibrosis in the right eye.  Dr. Yaplee also diagnosed posterior vitreous detachment in the left eye, which was due to natural

degenerative change.  Dr. Yaplee noted that there was no retinal tear or detachment, and he proposed a follow-up in one year.

35.  During Dr. Yaplee's examinations of Plaintiff on April 3, 2009, September 4, 2009, and May 27, 2010, he did not find a problem with Plaintiff's left eye which would indicate that Plaintiff had suffered eye trauma after his cataract surgery.

36.  On August 12, 2010, Plaintiff received an ophthalmology examination by Dr. Sofinski, who noted that the retained cortex debris was resolved.

37.  Plaintiff's medical records do not show that he received or aggravated any injuries to his eye from waiting outside on December 17, 2008.  Although in April 2009 and March 2010, clinicians observed floaters and pigment in Plaintiff's eye, this was later determined by an ophthalmologist to be retained cortex, or remnants from cataract surgery, and neither the floaters nor the pigment was caused by waiting outside on December 17, 2008.  None of Plaintiff's clinicians considered Plaintiff's exposure to weather as the cause for any eye issues.

### D.    Eighth Amendment Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted). To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial

risk of harm to their health or safety.  E.g., Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

"To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard - that the deprivation was serious enough to constitute cruel and unusual punishment - and a subjective standard - deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012).  For claims arising out of medical care in prison, Plaintiff must first show the existence of an objectively serious medical need.  Snow, 681 F.3d at 985.  The existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, and the existence of chronic or substantial pain are indications of a serious medical need. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted); accord Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012).

If Plaintiff satisfies the objective element of his Eighth Amendment claim, he must then show that Defendants Dutra and Soto's response to his medical need was deliberately indifferent. Wilhelm, 680 F.3d at 1122 (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.  Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096) (internal quotation marks omitted).  However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285 (1977); accord Snow, 681 F.3d at 987, and isolated occurrences of neglect generally do not rise to the level of an Eighth Amendment violation, O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990)

1  (quotation marks omitted); <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990); <u>accord</u>

2  <u>Snow</u>, 681 F.3d at 990.

3         **E.**    **Summary of Plaintiff's Motion**

4        In his motion for summary judgment, Plaintiff argues that Defendant Dutra was deliberately

5  indifferent to the post-surgical condition of his left eye and he sustained injuries to his left eye when

6  Defendant Dutra forced him to wait outside in the cold for his medical appointment instead of

7  allowing him to wait inside in the empty holding cell.

8        Plaintiff contends that after Dr. Yaplee operated and removed a cataract from his left eye on

9  September 16, 2008, he told Plaintiff to avoid exposing his left eye to water and harsh weather.

10  (Motion, Doc. 48, 5:10-14; Carroll Dec., Doc. 47, ¶2.)  Plaintiff contends that this advice was

11  significant because he has hyperthyroidism, or Graves' disease, and the medications he was taking

12  slowed the healing process.  (Motion, 5:15-19; Carroll Dec., ¶2.)  Plaintiff contends that when he

13  was transferred to PVSP on November 17, 2008, his eye was healing properly, which was confirmed

14  by receiving and release staff upon his arrival.  (Motion, 5:20-23; Carroll Dec., ¶3.)

15        On December 17, 2008, Plaintiff went to the Facility A medical clinic for lab work relating

16  to his Graves' disease.  (Motion, 5:24-27; Carroll Dec., ¶4.)  Plaintiff was not experiencing any

17  problems with his left eye at the time: no pain, tearing, fluid discharge, swelling, blood in the white

18  of his eye, or white mass in the iris obscuring his vision.  (Motion, 5:27-6:2; Carroll Dec., ¶5.)  It

19  was cold and damp and between 27 and 35 degrees outside, approximately.  (Motion, 6:2-3; Carroll

20  Dec., ¶5; Undisputed Fact 12.)

21        When Plaintiff arrived at the clinic, he informed Defendant Dutra that he recently had eye

22  surgery and his eye was still healing, but despite the availability of an indoor holding cell, Defendant

23  Dutra "took umbrage" when Plaintiff complained about having to wait outside in foul weather with

24  a wounded eye and ordered him outside.  (Motion, 6:5-11; Carroll Dec., ¶6.)

25        After approximately 30 minutes, Plaintiff's left eye began to tear up and hurt, and he was

26  shivering and having muscle spasms.  (Motion, 6:15-16; Carroll Dec., ¶8.)  Plaintiff reentered the

27  medical clinic and informed Defendant Dutra of this "scary development" and requested to wait in

28

the holding cell. (Motion, 6:16-18; Carroll Dec., ¶8.) Defendant Dutra refused Plaintiff's request and failed to alert the clinic nurses about Plaintiff's complaint of eye pain. (Motion, 6:18-20; Carroll Dec., ¶8.)

Plaintiff was afraid of going back outside and asked Defendant Dutra if he could return to his housing unit to wait for his appointment. (Motion, 6:22-24; Carroll Dec., ¶8.) Defendant Dutra told Plaintiff that it was the policy to have inmates wait outside for their medical appointments and if Plaintiff wanted to go back to his housing unit, he would have to sign a medical treatment refusal form. (Motion, 6:24-27; Carroll Dec., ¶8.) Plaintiff replied that he was not refusing medical treatment but wanted to return to his housing unit to wait because his left eye was tearing up and hurting from the cold. (Motion, 6:27-7:2; Carroll Dec., ¶8.) Defendant Dutra told him if he was not going to sign a refusal form, he needed to go back outside. (Motion, 7:3-5; Carroll Dec., ¶8.) Plaintiff again requested to wait in the holding cell, but Defendant Dutra refused and threatened him with disciplinary action if he did not leave the clinic. (Motion, 7:7-11; Carroll Dec., ¶8.)

After approximately 15 minutes, Plaintiff was unable to endure the pain and tearing anymore and he reentered the clinic and again requested to wait in the holding cell. (Motion, 7:12-14; Carroll Dec., ¶10.) Defendant Dutra refused Plaintiff's request and Plaintiff asked for his ID card back so he could return to his housing unit. (Motion, 7:14-16; Carroll Dec., ¶10.) Defendant Dutra refused to return the ID card unless Plaintiff signed a refusal of treatment form. (Motion, 7:16-18; Carroll Dec., ¶10.) In pain and under duress, Plaintiff signed the form and returned to his cell, at which time he looked in the mirror and saw the white of his left eye was bloody and there was a yellowish fluid oozing from the corner of the eye. (Motion, 7:18-23; Carroll Dec., ¶10.) In following days, Plaintiff's eye began to feel swollen and a white mass appeared in the iris of the left eye, obscuring his vision. (Motion, 7:24-26; Carroll Dec., ¶10.)

Plaintiff contends that he was examined by several specialists who detected floaters in his left eye and suspected retinal detachment. (Motion, 7:26-28; Carroll Dec., ¶12.) Plaintiff contends that doctors also found the left eye lens to be cloudy with pigment disposition and vision loss; and

///

he contends that there is an indication that Defendant Dutra's conduct actions were the cause of his injuries. (Motion, 8:2-6; Carroll Dec., ¶12.)

### F.   Summary of Defendants' Opposition and Cross-Motion

Defendants Dutra and Soto argue that Plaintiff's motion for summary judgment should be denied and their cross-motion for summary judgment should be granted because Plaintiff's left eye was healed from the cataract surgery and he did not have a serious medical need on December 17, 2008, he did not sustain any injuries to his eye on December 17, 2008, as a result of Defendants' actions, and Defendants are entitled to qualified immunity.

Defendants contend that Dr. Yaplee performed cataract surgery on Plaintiff's left eye on September 16, 2008. (Opp/Cross-Motion, Doc. 72-1, 2:7-8; Doc. 72-6, Barnett Dec., ¶7; Yaplee Dec., ¶2.) Dr. Yaplee saw Plaintiff for post-surgical follow-up examinations on September 18, 2008, and September 23, 2008, and he noted that Plaintiff was doing well and no problems were observed. (Opp/Cross Motion, 2:8-10; Barnett Dec., ¶¶9, 10; Yaplee Dec., ¶5.)

On December 16, 2008, Defendant Soto, a phlebotomist, issued Plaintiff a ducat for lab work at the Facility A medical clinic on December 17, 2008, at 8:30 a.m. (Opp/Cross Motion, 2:11-12; Doc. 72-8, Soto Dec., ¶2.) Plaintiff arrived at the clinic at approximately 8:18 a.m. (Opp/Cross Motion, 2:18-19; Doc. 17, Amend. Comp., ¶30.) Defendants Dutra and Soto were working at the clinic and the temperature ranged between 27 and 35 degrees outside, approximately. (Opp/Cross Motion, 2:18-21; Doc. 72-7, Dutra Dec., ¶6; Soto Dec., ¶3; Doc. 72-9, Req. for Jud. Not., Ex. A; Undisp. Fact 12.)

Defendants do not dispute that Defendant Dutra required Plaintiff to stand outside and would not allow him to wait in the holding cell. Defendants contend however, that at that point, three months had passed since Plaintiff's cataract surgery and unless significant complications occur, patients are essentially healed from surgery within one month. (Opp/Cross Motion, 2:13-15; Barnett Dec., ¶29; Yaplee Dec., ¶4.) No significant complications occurred with Plaintiff's surgery and his medical records indicate that his eye had healed from the surgery by December 17, 2008. (Opp/Cross Motion, 2:15-17; Barnett Dec., ¶29; Yaplee Dec., ¶5.) Defendants contend that by that

date, Plaintiff's eye was about as vulnerable to injury as an average person's eye and the average person's eye is not at serious risk from standing outside in cool, damp weather. (Opp/Cross Motion, 3:6-8; Barnett Dec., ¶29.) Defendants contend that waiting outside for his medical appointment did not aggravate or cause injury to Plaintiff's eye and at most, it caused slight irritation. (Opp/Cross Motion, 38-10; Barnett Dec., ¶¶30, 31.)

Defendants Dutra and Soto dispute that Plaintiff informed them that he recently had cataract surgery and his eye was still healing or that his eye was hurting and tearing up from the cold. (Dutra Dec., ¶7; Soto Dec., ¶¶5, 6.)

On December 30, 2008, Plaintiff was examined by an optometrist, who did not note any abnormalities in his eyes. (Opp/Cross Motion, 3:12-13; Barnett Dec., ¶17.) Defendants contend that between December 17, 2008, and April 2, 2009, Plaintiff did not submit any requests for health care services for his eye, but he submitted multiple requests for other medical issues; and that between December 17, 2008, and April 2, 2009, Plaintiff did not have any routine or emergency appointments with an ophthalmologist. (Opp/Cross Motion, 3:14-18; Barnett Dec., ¶18.)

Plaintiff was examined by Dr. Yaplee on April 3, 2009, September 4, 2009, and May 27, 2010, and during those examinations, Dr. Yaplee did not find any problem with Plaintiff's left eye which would indicate that Plaintiff suffered eye trauma after his cataract surgery. (Opp/Cross Motion, 3:19-21; Barnett Dec., ¶¶19, 20, 27; Yaplee Dec., ¶¶6, 7.) Defendants contend that Plaintiff did not suffer retinal detachment and his vision was repeatedly found to be 20/20. (Opp/Cross Motion, 3:22-23; Barnett Dec., ¶27; Yaplee Dec., ¶6.) In April 2009 and March 2010, clinicians observed floaters and pigment in Plaintiff's eye, but the cause was later determined to be retained cortex debris, or remnants from cataract surgery; the floaters and pigment were not caused by waiting outside on December 17, 2008. (Opp/Cross Motion, 3:23-4:4; Barnett Dec., ¶¶19, 24, 26, 37; Yaplee Dec., ¶6.) Defendants contend that Plaintiff's medical records indicate that none of the clinicians considered Plaintiff's exposure to weather to be the cause of any eye issues. (Opp/Cross Motion, 4:4-5; Barnett Dec., ¶¶39, 40; Yaplee Dec., ¶7.)

///

1  **G.**  **Findings**

2  Despite the wide-ranging arguments, the existence of numerous immaterial disputed issues

3  of fact, and the submission of multiple exhibits, some of which are admissible and some of which

4  are inadmissible, this case presents a narrow issue.  Plaintiff's Eighth Amendment medical care

5  claim is viable only if he can demonstrate that on December 17, 2008, his left eye presented an

6  objectively serious medical condition in that because it was still healing from cataract surgery,

7  waiting outside in cold, damp weather conditions was medically contraindicated.  If Plaintiff is able

8  to demonstrate the existence of a serious medical need or condition with respect to his left eye, he

9  must then demonstrate that Defendants Dutra and Soto knowingly disregarded the excessive risk of

10  harm to his health created by the exposure of his left eye to cold, damp weather conditions.

11  **1.**  **Plaintiff's Motion for Summary Judgment**

12  Plaintiff bears the burden of proof at trial and to prevail on his motion for summary judgment

13  against Defendant Dutra, Plaintiff must affirmatively demonstrate that no reasonable trier of fact

14  could find other than for him.  Soremekun, 509 F.3d at 984.  If Plaintiff meets his initial burden,

15  Defendant Dutra is required to set forth specific facts showing there is a genuine issue for trial.  Id.

16  In this instance, the Court finds that Plaintiff has not met his burden as the moving party.  As

17  an initial matter, Plaintiff must prove that his left eye, because it was still healing from cataract

18  surgery and was not supposed to be exposed to inclement weather, constituted a serious medical

19  need.  However, Plaintiff has submitted no admissible evidence that his left eye was still healing

20  from the cataract surgery on December 17, 2008, or that Dr. Yaplee instructed him to avoid harsh

21  weather conditions and water.  Plaintiff's lay opinions that his eye was still healing and that he

22  healed slower due to having Graves' disease are not admissible, and Dr. Yaplee's purported

23  instruction to avoid water and harsh weather is hearsay for which there is no exception.

24  In the absence of any admissible evidence that Plaintiff's left eye was still healing from

25  cataract surgery and exposure of the eye to harsh weather conditions and water was medically

26  contraindicated, Plaintiff fails to meet his burden of demonstrating the existence of an objectively

27

28

serious medical condition on December 17, 2008, and his motion for summary judgment must be denied.

## 2.   Defendants' Cross-Motion for Summary Judgment

### a)   Defendants' Position

Defendants Dutra and Soto do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d at 387.

Through the declarations of Drs. Barnett and Yaplee, Defendants have submitted evidence demonstrating that Plaintiff did not have an objectively serious medical need with respect to his left eye on December 17, 2008.  Plaintiff had cataract surgery on his left eye three months earlier. Plaintiff was instructed to place a patch on his eye for one day and then wear a patch at bedtime for a week; return to the clinic for a follow-up visit in two days; refrain from driving, operating machinery, or drinking alcohol for the first twenty-four hours following surgery; avoid bending or lifting weights greater than twenty pounds; and refrain from rubbing the eye.  Plaintiff was given no written instructions to avoid harsh weather or getting water in his eye, and Dr. Yaplee denies giving Plaintiff those instructions.

Absent significant complications, which are rare, patients are essentially healed within one month after the surgery, and Plaintiff's two post-surgical follow-ups with Dr. Yaplee on September 18, 2008, and September 23, 2008, did not show any significant complications from the surgery.

Dr. Yaplee saw Plaintiff again on April 3, 2009, and he noted vitreous floaters in Plaintiff's left eye.  Dr. Yaplee recommended that Plaintiff be observed for signs of retinal detachment. Following examinations on September 4, 2009, and May 27, 2010, Dr. Yaplee concluded that Plaintiff had not experienced a retinal tear; and during none of the examinations did Dr. Yaplee find a problem with Plaintiff's left eye which would indicate that Plaintiff had suffered eye trauma after his cataract surgery.

///

On March 23, 2010, during a routine examination from an optometrist, Plaintiff complained about white matter in the iris in his left eye, which had obscured his vision for the past 1 to 1 ½ years. The optometrist noted pigment in Plaintiff's iris and referred Plaintiff to ophthalmology.

Plaintiff was seen by Dr. Sofinski on May 12, 2010. Dr. Sofinski noted that Plaintiff had a few pigment fragments from residual cortex at the periphery of his left eye and that the dissolving of the residual cortex explained Plaintiff's reports of floaters in his left eye.

Plaintiff was referred back to Dr. Yaplee, who saw him on May 27, 2010, and concluded that he did not have a retinal tear, as summarized previously.

On August 12, 2010, Plaintiff was again seen by Dr. Sofinski, who found no evidence of retinal tear.

Dr. Barnett concludes that based on his experience and training, and his review of Plaintiff's medical records, there was no serious risk to Plaintiff's eye from standing outside in cold, damp weather on December 17, 2008. By that date, Plaintiff's eye was about as vulnerable to injury as an average person's eye, and an average person's eye is not at risk from standing outside in cold, damp weather. In addition, Plaintiff did not receive or aggravate any injury to his left eye from standing outside on December 17, 2008, and at most, he would have experienced slight irritation.

Based on this medical evidence, the Court finds that Defendants have met their burden of demonstrating that the post-surgical condition of Plaintiff's left eye did not constitute an objectively serious medical need on December 17, 2008, and the burden shifts to Plaintiff to cite to admissible evidence which creates a triable issue of fact.

### b)      Plaintiff's Position

Plaintiff may not create a triable issue of fact by merely attacking the credibility of Drs. Barnett and Yaplee, as he attempts to do. See National Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert . . . judgment.") As medical doctors, they are entitled to testify as expert witnesses, Fed. R. Evid. 702, while Plaintiff is not and he is limited

1  to testifying as to issues which are within his personal knowledge and to which expertise is not

2  required, Fed. R. Evid. 701.

3      Plaintiff may testify that he has Graves' disease,[10] and that when he was standing outside in

4  the cold on December 17, 2008, he felt pain in his left eye and his left eye was tearing up.  Further,

5  Plaintiff is qualified to attest that when he returned to his cell, he saw blood in the white of his eye

6  and a yellowish discharge in the corner.  These are matters within Plaintiff's personal knowledge to

7  which he may attest, and Defendants' objections that these matters require medical expertise are

8  overruled.   However, while the Court accepts these facts as true for the purpose of resolving

9  Defendants' motion, these facts do not assist Plaintiff in demonstrating that on December 17, 2008,

10 his left eye was not fully healed from cataract surgery and standing outside in harsh weather

11 conditions was therefore medically contraindicated.

12     Construing Plaintiff's admissible evidence in the light most favorable to him, Dr. Yaplee,

13 an ophthalmologist, performed cataract removal surgery on Plaintiff's left eye on September 16,

14 2008, at which time Plaintiff was incarcerated at Kern Valley State Prison.  On November 17, 2008,

15 Plaintiff was transferred to PVSP and he was given medication and placed on a list to see a doctor.

16     On December 16, 2008, Plaintiff was issued a ducat for lab work the next day relating to his

17 Graves' disease, and on December 17, 2008, at approximately 8:18 a.m., Plaintiff reported to the

18 medical clinic for his lab work.  When Plaintiff left his cell for that appointment, his left eye felt fine

19 and he was not experiencing any problems with it.[11]

20

21     [10] Although Plaintiff may testify that he has Graves' disease and Defendants do not dispute that he does, this
fact is irrelevant in the absence of any admissible evidence that the condition impacted the healing of his eye,

22 rendering it vulnerable to the cold weather on December 17, 2008.  The Court notes that Plaintiff also argues that
because of his condition, he can more easily succumb to hypothermia and he was inadequately dressed for the

23 weather.  This case does not involve hypothermia or a claim based on inadequate clothing.  Those issues are
irrelevant and will not be further addressed.

24     [11] There exist factual disputes regarding whether or not Plaintiff complained of and sought medical
treatment for problems with his left eye prior to December 17, 2008.  Plaintiff denies that he did and his position is

25 accepted as true in resolving Defendants' cross-motion.  (Doc. 80, Carroll Dec., ¶¶6-8.)  Despite Defendants'
objections, the Court finds that Plaintiff is qualified to testify that these events did not occur and that he did not fill

26 out the health care services request form dated November 23, 2008; these matters do not require medical expertise.
(Doc. 72-5, Exs. I, J, K.

27

28

1    The morning of December 17, 2008, was gray and damp, although it was not raining, and it

2    was cold outside, with the air temperature ranging somewhere between 27 and 36 degrees,

3    approximately.  Plaintiff waited outside in the cold between 45 minutes and 1 hour and 22 minutes,

4    approximately, during which time Plaintiff experienced pain and tearing in his left eye, which he

5    reported to Defendant Dutra during the course of two interactions.  Plaintiff ultimately signed a

6    refusal of treatment form and returned to his cell after repeatedly being denied permission to wait

7    inside the medical clinic.  Upon his return to his cell, Plaintiff observed that his left eye was bloody

8    in the white area and there was a yellow substance in the corner of his eye.

9    Although Plaintiff argues that Defendants' recitation of the facts regarding his various post-

10   December 17, 2008, medical appointments leaves out some of the doctors' findings, interpretation

11   of medical records must generally be made by medical experts.  The doctors' findings in 2009 and

12   2010 relating to Plaintiff's left eye go to the issue of harm caused and do not assist Plaintiff in

13   demonstrating that he had a serious medical need on December 17, 2008.  In any event, there is no

14   dispute regarding the ultimate determination, which was that Plaintiff did not experience retinal

15   detachment or tearing, and Plaintiff's floaters and the pigment in his iris were explained by retained

16   

17   The Court also overrules Defendants' objections to the declaration of Michelle Morris.  (Doc. 87, Def. Obj,

18   p. 3, lns. 3-6.)  The declaration is relevant in that it supports Plaintiff's position that he did not fill out the request
     form at issue because it does not bear his signature and the issues to which Ms. Morris attests do not require medical

19   expertise.  (Doc. 79, Ex. 8, p. 36.)  Ms. Morris attests that she was correctional officer for CDCR and worked with
     the forms on a daily basis.  This is sufficient to show that Ms. Morris has the personal knowledge necessary to testify

20   that the request forms must be signed by the inmate or they are invalid.  Barthelemy v. Air Line Pilots Ass'n, 897
     F.2d 999, 1018 (9th Cir. 1990).

21   The Court further overrules Defendants' objections to the health care services request forms submitted by
     Plaintiff.  (Doc. 79, Ex. 9.)  The forms are relevant in as much as they support Plaintiff's argument that the forms

22   require an inmate signature, in contrast to Exhibit J, which does not bear Plaintiff's signature.  Further, the forms are
     not being submitted for the truth of the matters asserted therein, Fed. R. Evid. 801(c)(2), and the forms may be

23   authenticated through their distinctive characteristic, Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC v. Nehme, 632
     F.3d 526, 533 (9th Cir. 2011).

24   Finally, the Court partially overrules Defendants' objections to the declaration of Eloise Carroll, who is
     Plaintiff's wife.  (Doc. 79, Ex. 11, p. 51; Doc. 87, p. 3 lns. 13-19.)  Mrs. Carroll's declaration states that she visited

25   Plaintiff often in early November 2008, which is sufficient to support her statement that in early November 2008, she
     did not see blood in Plaintiff's left eye and he did not complain to her about his left eye.  The remainder of the

26   declaration is irrelevant in part and lacks foundation regarding her statement that Plaintiff did not start complaining
     until December 2008.

27   

28

1   cortex debris from the cataract surgery, which was resolved by August 12, 2010.  In sum, those

2   documented issues with Plaintiff's eye were caused by the retained cortex debris from the surgery

3   and there is no medical evidence that standing outside on December 17, 2008, caused those issues

4   or any other damage to Plaintiff's left eye.[12]

5           The existence of an objectively serious medical need on December 17, 2008, is a necessary

6   element of Plaintiff's Eighth Amendment claim against Defendants and in the absence of evidence

7   supporting the existence of an objectively serious medical need,  Plaintiff's claim fails as a matter

8   of law and the Court does not reach the subjective element of deliberate indifference.  There is no

9   admissible evidence that because Plaintiff had cataract surgery three months earlier, standing outside

10  in cold, damp weather was medically contraindicated and presented an objectively serious risk of

11  harm to Plaintiff's left eye.  To the contrary, the admissible evidence shows that Plaintiff's eye was

12  healed from the cataract surgery and was no more vulnerable than the average person's eye, which

13  is not vulnerable to standing outside in the cold for approximately 1 hour and 22 minutes.  As a lay

14  witness, Plaintiff cannot raise a triable issue of fact as to whether he had a serious medical condition

15  by way of his opinion that he needed to avoid harsh weather and Plaintiff has not submitted any

16  admissible evidence that he was instructed to avoid exposing his left eye to inclement weather.

17  ///

18  ///

19

20          [12] Dr. Sofinski's purported statements, which include her body language and facial expressions, are hearsay
    and they are inadmissible. (Doc. 80, Carroll Dec., ¶26.)  The Court rejects Plaintiff's argument that the exceptions
21  for present sense impressions and statements made for medical diagnosis or treatment apply.  Fed. R. Evid. 803(1),
    (4); U.S. v. Murillo, 288 F.3d 1126, 1137 (9th Cir. 2002) (Rule 803(a) applies to statements describing events or
22  conditions made by declarants having personal knowledge of the events or conditions); Bemis v. Edwards, 45 F.3d
    1369, 1373 (9th Cir. 1995) (present sense impression statement must be nearly contemporaneous with the incident
23  described and made with little chance ro reflection and must be made by witness with personal knowledge)
    (quotation marks omitted); Bulthuis v. Rexall Corp., 789 F.2d 1315, 1316 (9th Cir. 1986) (Rule 803(4) applies only
24  to statements made by a patient to a doctor).  Plaintiff's argument that Rule 804(b)(3) applies is also rejected; no
    showing has been made that Dr. Sofinski is unavailable as a witness and not withstanding that fatal deficiency, her
25  statement would not qualify as a statement against interest.  Fed. R. Evid. 804(b)(3).  Finally, the Court rejects
    Plaintiff's argument that the statement falls within the residual hearsay exception; Dr. Sofinski's statement is garden
26  variety hearsay lacking in any circumstantial guarantees of trustworthiness.  Fed. R. Evid. 807; U.S. v. Sanchez-
    Lima, 161 F.3d 545, 547 (9th Cir. 1998) ("Hearsay evidence sought to be admitted under Rule 807 must have
27  circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule.").

28

1    Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law on

2    Plaintiff's Eighth Amendment claim against them and the Court recommends that their cross-motion

3    for summary judgment be granted.

4    **IV.    Recommendation**

5    For the reasons set forth above, the Court HEREBY RECOMMENDS that:

6    1.    Plaintiff's motion for summary judgment, filed on March 28, 2012, be DENIED; and

7    2.    Defendants' cross-motion for summary judgment, filed on July 26, 2012, be

8          GRANTED, thus concluding this action in its entirety.

9    These Findings and Recommendations will be submitted to the United States District Judge

10   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**

11   **days** after being served with these Findings and Recommendations, the parties may file written

12   objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

13   Findings and Recommendations."  The parties are advised that failure to file objections within the

14   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

15   1153 (9th Cir. 1991).

16

17

18

19   IT IS SO ORDERED.

20   **Dated:    January 4, 2013**                    **/s/ Sheila K. Oberto**
                                          UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28